1  Jonathan A. Backman                           E-filed on: December 29, 2009
   Law Office of Jonathan A. Backman
2  117 N. Center Street
   Bloomington, Illinois 61701-5001
3  (309) 820-7420
   jbackman@backlawoffice.com
4  Counsel for the Liquidating Trustee

5

6           **IN THE UNITED STATES BANKRUPTCY COURT**
                      **DISTRICT OF NEVADA**
7

8  **IN RE:**                           )    Chapter 11
                                        )
9  **XYIENCE INCORPORATED,**            )
   a Nevada corporation,                )    No. BK-S-08-10474-MKN
10                                      )
   Debtor.                              )
11 _____   )
                                        )
12 **DAVID HERZOG,**                    )
   as Liquidating Trustee,              )
13                                      )
   Plaintiff,                           )    Adversary Case No. _____
14                                      )
   v.                                   )
15                                      )
   **ZYEN, LLC, a Nevada limited liability** )
16 **company, FERTITTA ENTERPRISES,**  )
   **INC., a Nevada corporation, WILLIAM** )
17 **BULLARD, ADAM FRANK, KIRK**       )
   **SANFORD, and OMER SATTAR**        )
18                                      )
   Defendants.                          )
19
                      **COMPLAINT**
20
            Plaintiff David Herzog, as Liquidating Trustee (the "Trustee") for the
21
   estate of Xyience Incorporated (the "Debtor"), the former debtor and debtor in
22
   possession the above-captioned Chapter 11 case (the "Case"), complains against
23
   defendants Zyen, LLC, a Nevada limited liability company ("Zyen"), Fertitta
24
   Enterprises, Inc. a Nevada corporation ("Fertitta" or "Fertitta Enterprises"), Adam
25
   Frank, Kirk Sanford, William Bullard and Omer Sattar as follows:
26

27

28

### BANKRUPTCY CASE

1.      On January 18, 2008 (the "Petition Date"), the Debtor filed in this Court (the "Court") its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code" or the "Code").

2.      Pursuant to an Order entered January 31, 2008 (the "Avoidance Date Order"), the Court dismissed, with prejudice, an involuntary petition for relief under chapter 11 of the Bankruptcy Code filed against the Debtor on January 3, 2008, as Case No. BK-S-08-10049-MKN.

3.      The Avoidance Date Order further provides that, in this Case, the period for avoidance actions under the applicable provisions of the Bankruptcy Code will be measured as if the petition date in this Case were January 3, 2008 (the "Extended Avoidance Date").

4.      From January 18, 2008 through the October 23, 2008, entry of the Plan Confirmation Order (as hereinafter defined), the Debtor operated and managed its business affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.      On May 19, 2008, the Debtor filed its Plan of Reorganization ("Plan"), which provided, among other things, that substantially all of the Debtor's remaining assets, including all of its pre-petition claims, rights and causes of action, and all of its right and powers to pursue avoidance actions under Chapter 5 of the Bankruptcy Code, would be transferred to and would vest in a Liquidating Trust for the benefit of various creditor classes.

6.      The Plan further provided that, upon the Effective Date of the Plan, a Liquidating Trustee would represent the Trust Estate.

7.      On October 23, 2008, the Court entered an Order (the "Plan Confirmation Order") approving the Debtor's Disclosure Statement in connection with the Plan and confirming the Plan of Reorganization.

8.      On November 12, 2009, the Court entered an Order authorizing the Trustee to accept the appointment as Liquidating Trustee, and the Trustee accepted his appointment on that day.

9.      On November 20, 2009, the Trustee caused notice of appointment to be filed and served, and on November 23, 2009, the Plan became effective.

## JURISDICTION

10.      The Court possesses subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b).

11.      This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157.

12.      Venue of this Adversary Proceeding lies in this judicial district under 28 U.S.C. 1409(a) because the Bankruptcy Case is pending here.

## PARTIES

13.      Plaintiff is the Liquidating Trustee.

14.      Zyen is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

15.      Fertitta Enterprises is a Nevada corporation with its principal place of business in Las Vegas, Nevada.

16.      Mr. Bullard is a resident of Las Vegas, Nevada.

17.      Mr. Sanford is a resident of Las Vegas, Nevada.

18.      Mr. Frank is a resident of Las Vegas, Nevada.

19.      Mr. Sattar is a resident of Las Vegas, Nevada.

3

## INTRODUCTION

20.     This Adversary Complaint arises from the premeditated decision of Fertitta Enterprises, including one of its officers and lead operators (Mr. Bullard), to take over ownership of the Debtor while stripping the Debtor's secured and unsecured creditors of the considerable value that they possessed through their claims against the Debtor and its assets.

21.     Under the pretext of providing secured financing to the Debtor, Fertitta, and then its controlled affiliate Zyen, assumed control over the Debtor's assets, its management, its bankruptcy case, its asset purchaser and ultimately, its entire business and operation.

22.     Along the way, Fertitta, Zyen, Mr. Bullard and two of the Debtor's previously independent directors, defendants Frank and Sanford, received preferences and other avoidable transfers and breached their fiduciary duties to the Debtor and its creditors in multiple ways.

## BACKGROUND FACTS

23.     The Debtor is a Nevada corporation with its principal place of business in Las Vegas, Nevada.

24.     Since its founding in May 2004, the Debtor has been engaged in the production, sale, marketing, and distribution of, among other things, energy drinks, fitness supplements, nutritional products, and apparel that are distributed around the United States and Canada.

25.     The Debtor's principal line of business involves the sale and marketing of its energy drink (XenergyTM) which the Debtor advertises largely through its sponsorship of the Ultimate Fighting Championship (the "UFC").

26.     In or about January 2007, the Debtor entered into a sponsorship agreement with Zuffa Marketing, LLC ("Zuffa Marketing" or "Zuffa"), a Nevada limited

4

liability company that operates and does business as the Ultimate Fighting

Championship mixed martial arts production and network.

27.    Through this marketing agreement, the Debtor became an

important sponsor of, and source of revenue for, Zuffa Marketing.

28.    Zuffa Marketing was and is wholly owned by Zuffa, LLC.

29.    Zuffa, LLC, is an affiliate of Fertitta Enterprises.

30.    In or around June 2007, with the Debtor facing financial problems

and having difficulty meeting its payment obligations to Zuffa Marketing, the owners of

these two entities decided, for various reasons, decided to take over ownership and

control of the company.

31.    As part of this plan, Zuffa accepted large amounts of stock in

addition to and in lieu of payments from the Debtor.

32.    When it became evident that the Debtor's financial structure —

that is, its secured and other unsecured creditors, and the substantial number of

outstanding stockholders — would render an ordinary takeover through stock

acquisition too expensive, Zuffa and its owners decided instead capture the company

through a series of secured loans, forced defaults and then a foreclosure of the assets.

33.    Fertitta Enterprises and its senior officer, Mr. Bullard, took the

lead in effecting the plan.

34.    In or about June and July 2007, through promises of personal

financial gain and of an ownership interest in a new entity that would own the Debtor's

assets and business, Mr. Bullard and his colleagues at Fertitta persuaded Mr. Frank,

the Debtor's Chairman, Chief Executive Officer and President, and Mr. Sanford,

another board member and de-facto co-Chief Executive Officer along with Mr. Frank, to

work with Fertitta and Mr. Bullard to enable Fertitta to take over the company through

its lend-to-own strategy.

35.    At this point, Mr. Frank ceased pursuing and terminated all

negotiations with other sources of financing for the company — including substantial

5

sources, such as Burrill & Company, LLC, from which the Debtor could have obtained traditional debt and equity financing on favorable terms — and looked to Fertitta (and then its newly-created affiliate Zyen) as its sole financier.

36.    In June 2007, Mr. Frank and Mr. Sanford, neither of whom had been elected by shareholders to the Debtor's board of directors, cancelled a stockholder's meeting scheduled for that summer, and failed to conduct another one, despite being required by Nevada law to do so, before the Debtor filed this Case.

37.    The reason that these two defendants refused to conduct a shareholders' meeting was to prevent shareholders from electing directors who would interfere with their efforts to give control and then ownership of the Debtor's business and assets to Fertitta.

38.    On or about July 26, 2007, Fertitta Enterprises, Mr. Frank and Mr. Sanford lent the Debtor a total of $1.5 million — i.e., $1 million, $250,000.00 and $250,000.00, respectively — as the first stage of their lending scheme.

39.    In or about September and early October 2007, Mr. Frank notified several of the Debtor's secured creditors and approximately 10 or so of its more than 380 stockholders that he was going to shut down the company, and thereby destroy its value entirely, unless the secured lenders subordinated to, and shareholders holding 70% of the outstanding shares of the corporation consented to, a new $12.0 million senior secured loan from Fertitta Enterprises.

40.    At the same time, Mr. Frank advised these persons and entities that the loan was going to be used principally for working capital.

41.    Faced with these threats, the secured lenders agreed to subordinate their loans, and and shareholders holding approximately 60% of the outstanding shares of the corporation, many of whom also were unsecured creditors of the Debtor as well, agreed to the financing.

6

42. At the time, the secured lenders and other creditors did not know, and had not been told by Fertitta or by Messrs. Bullard, Frank and Sanford (a) that Fertitta as well as Mr. Frank and Mr. Sanford, would be receiving substantial portions of the $12 million loan proceeds in payment of their antecedent debts, (b) that Zuffa would receive more than $4.5 million on account of an antecedent debt that the Debtor did not need to pay, (c) that the true purpose of the loan was to provide Fertitta (or its affiliates) to obtain control and ownership of the Debtor's business and assets, or (d) that upon agreeing to Mr. Frank's demands, these parties' claims would effectively be worthless because the Debtor intended to default on its very first payment obligation under the new loan facility.

43. At or about this time, Fertitta's owners caused Zyen to be created for the purpose of funding the loan, and provided Zyen with the funds with which to make the loan.

44. On or about October 4, 2007, Zyen consummated the loan, lending the Debtor approximately $9.5 million that day, and another $2.5 million within the next several weeks.

45. At this time, the Debtor had numerous unsecured and undersecured creditors.

46. Despite receiving substantially less than the 70% support that Mr. Frank had indicated would be required (absent a waiver) to proceed with the financing, the Debtor accepted the funds and, in exchange, granted Zyen a security interest in all or substantially all of the Debtor's assets.

47. As part of the financing, Mr. Bullard became a member of the Debtor's board of directors, so that Mr. Frank, Mr. Sanford and Mr. Bullard constituted 50% of the now six-member board.

48. In addition, Messrs. Sanford and Frank advised the board that they would not conduct a board meeting until William Underhill ("Underhill"), a

7

1   disinterested and independent director, resigned, thereby effectively granting Messrs.

2   Sanford, Frank and Bullard 60% control of the new board.

3          49.    At all times periods at issue in this complaint, Mr. Bullard was

4   acting within the scope of his position as an officer of Fertitta Enterprises.

5          50.    From and after October 4, 2007, Mr. Bullard, in his capacity as an

6   officer of, and in acting for the benefit of, Fertitta Enterprises and Zyen, had control

7   over and final decision-making authority over every significant expenditure that the

8   Debtor made and virtually all of its assets, business and financial decisions.

9          51.    At the time Zyen made the loan, Zyen, Fertitta and Mr. Messrs.

10  Frank, Sanford and Bullard intended and planned that the Debtor promptly would

11  default on the loan and that Zyen would foreclose on and take over control of all of the

12  Debtor's assets.

13         52.    Also on or about the same day as the Zyen loan, Mr. Frank and Mr.

14  Sanford caused the Debtor to enter into a new sponsorship agreement with Zuffa that

15  was far more favorable to Zuffa than the January 2007 agreement.

16         53.    On October 5, 2007, the Debtor used the Zyen loan proceeds to make

17  the following payments, among others: (a) $4.5 million to Zuffa (substantially all of which

18  was on account of missed payments under the January sponsorship agreement);

19  (b) $1,029,166.67 to Fertitta Enterprises; (c) $257,187.50 to Mr. Frank; and

20  (d) $257,187.50 to Mr. Sanford.

21         54.    At the time of these payments, Zyen had not yet perfected its

22  security interest in the Debtor's assets — perfecting its interest in many of those assets

23  on or about October 16, 2007, and in the Debtor's accounts and cash on November 7, 2007

24  — and no other party possessed a perfected security interest in the Debtor's cash or

25  accounts as of this time.

26         55.    On or about November 4, 2007, the Debtor, by Mr. Frank, and with

27  the support of Mr. Sanford and the direction of Mr. Bufford, and despite having in excess

28  of $1.0 million in cash on hand to make its first payment (of between $100,000 and

8

1    $150,000) on the Zyen note, intentionally failed to make the payment, thereby placing the

2    Debtor in default of the Zyen loan agreements.

3           56.    On or about the same day, Mr. Sanford became the co-Chief

4    Executive Officer of the Debtor.

5           57.    In or around late November 2007, the Debtor, by Mr. Frank, and

6    with the support of Messrs Sanford and Bullard, and despite having had more than

7    sufficient cash during the prior month to make the payment then due under the new

8    Zuffa sponsorship agreement, caused the Debtor to default under that agreement so as to

9    provide Zuffa and Zyen with maximum flexibility in negotiating a new sponsorship

10   agreement beneficial to them once Zyen foreclosed on the Debtor's assets.

11          58.    Despite knowing that the Debtor would be defaulting on its

12   sponsorship agreement, and thus would be prohibited from selling merchandise

13   containing the UFC label and trademark, Messrs. Bullard, Frank and Sanford,

14   throughout November and December 2007, caused the Debtor to order and have millions

15   of dollars worth of product manufactured with the UFC label so that the Debtor would be

16   forced to deal with Zuffa, on Zuffa's terms, when following the Zyen strict foreclosure, the

17   Debtor was forced into a bankruptcy proceeding.

18          59.    In December 2007, as the parties had planned, Zuffa terminated the

19   October sponsorship agreement.

20          60.    In or about the first week of December 2007, Zyen, with the Debtor's

21   consent, commenced a strict foreclosure under Article 9 of the Uniform Commercial Code

22   to take ownership of all of the Debtor's assets.

23          61.    In engaging in the acts set forth above to cause ownership and

24   control of the Debtor's business to be taken over by Zyen — for the benefit of Fertitta,

25   Zyen, Zuffa and their owners — Messrs. Frank, Sanford and Bullard were violating their

26   fiduciary duties to the Debtor's creditors and shareholders, and knew that they were

27   doing so.

28

9

62.     For this reason, beginning in October 2007, the three men began meeting with supposedly independent persons from Canada (i.e., from Manchester Consolidated Corp.) to serve as a front for the transfer of assets following Zyen's foreclosure of the assets or, if necessary, a forced asset sale during a bankruptcy case.

63.     These meetings occurred in Nevada and in Canada, with one or more of Messrs. Frank, Sanford and Bullard present, during the months of October through January 2008.

64.     During these meetings, Mr. Bullard reached an agreement with Manchester pursuant to which Manchester would purchase the Debtor's assets, would create a new entity to do business as Xyience ("New Xyience") and would grant Zyen a controlling interest in the new entity.

65.     In mid-October 2007, Mr. Sanford induced Mr. Sattar, with whom he was engaged in other business ventures, to join the Debtor's management because Mr. Sanford knew that his scheming with Fertitta and Zyen was going to result in his eventual removal from the company.

66.     In mid-November 2007, Mr. Sattar became the President and Chief Operating Officer of the Debtor, and joined the plan of Messrs. Frank, Sanford and Bullard to give Zyen ownership and control of the Debtor's assets and business through control over New Xyience.

67.     Immediately following the Debtor's bankruptcy filing in January 2008, Mr. Sattar became a Director of the Debtor and the Debtor's president and designated representative.

68.     Also immediately following the Debtor's bankruptcy filing in January 2008, Mr. Sattar, in concert with Mr. Bullard, negotiated agreements with Zyen and Zuffa — i.e., a debtor in possession lending facility and a new license agreement, respectively — solely for the purpose of granting Zyen and Zuffa full control over the Debtor's business and assets, thereby ensuring that the two entities could direct that the Debtor's assets be sold to Manchester and ultimately to New Xyience.

10

69.     During these negotiations, Mr. Sattar pursued only the best interests of Zyen and Zuffa, not the Debtor and its creditors and shareholders, and the deal he struck with these entities was substantially less favorable than Mr. Sattar could have achieved for the Debtor had he not been serving the interests of Zyen, Zuffa and their insiders.

70.     At the time that Mr. Sattar engaged in this conduct, he knew that his conduct constituted a breach of his fiduciary duty, but he did so anyway based on assurances from insiders of Zyen and Zuffa, as well as Mr. Sanford, that they would protect and benefit him following his tenure with the Debtor.

71.     In or around April 2008, the Debtor consummated a sale to Manchester at the direction of Mr. Bullard and other insiders of Zyen and Zuffa.

72.     Shortly thereafter, Manchester, in accordance with the parties' agreement, defaulted on its obligations to Zyen and allowed Zyen to covert its debt into equity, and Zyen thereby became the owner of Manchester's (i.e., the Debtor's) assets and business, precisely as planned back in June through January 2007.

73.     Had the Debtor, from and after May 2007, been pursuing bona fide third party financing, it could have obtained such financing, its sales would have continued to grow and it ultimately would have avoided bankruptcy and survived as solvent and profitable entity.

74.     Instead, as direct result of the conduct of the defendants herein, the Debtor was forced into a liquidating Chapter 11 case and left with no assets (other than avoidance actions and related claims) and tens of millions of dollars in unpaid debts.

**COUNT I: PREFERENCE**
**(11 U.S.C. § 547)**
**(Against Mr. Frank)**

75.     The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

76.     Prior the Petition Date, the Debtor was indebted to Mr. Frank.

11

77. Within the one year prior to the Petition Date, on or about October 5, 2007, Mr. Frank received a payment of $257,187.50 from the Debtor, or from property of the Debtor (the "Frank Payment").

78. At the time of the Frank Payment, Mr. Frank was an insider of the Debtor in that he was a director, president and chief executive officer.

79. The Frank Payment was made to Mr. Frank for or on account of an antecedent debt owed by the Debtor to him before the payment was made.

80. The Frank Payment was made while the Debtor was insolvent.

81. The Frank Payment enabled defendant to receive more than Mr. Frank would have received in this Case if the Case were a case under Chapter 7 of the Bankruptcy Code, the Payment had not been made and, instead of the Payment, Mr. Frank had received payment on its claim under the applicable provisions of the Bankruptcy Code.

82. Accordingly, the Trustee is entitled to avoid the Frank Payment pursuant to section 547(a) of the Bankruptcy Code, and is entitled to recover the amount of such Payment from Mr. Frank pursuant to section 550(a)(1) of the Bankruptcy Code.

**COUNT II: INSIDER TRANSFER**
**Nevada Uniform Fraudulent Transfer Act**
**(NRS 112.140 et seq.)**
**(Against Mr. Frank)**

83. The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

84. At the time of each of the Frank Payment, Mr. Frank was an insider of the Debtor under section 150(7) of the Nevada Uniform Fraudulent Transfer Act in that defendant was a director, president and chief executive officer of the Debtor.

85. At the time of the Frank Payment, defendant had reasonable cause to believe that the Debtor was insolvent.

86. Accordingly, the Trustee is entitled to avoid the Frank Payment pursuant to section 544(b) of the Bankruptcy Code and section 190 and 210 of the Nevada

12

1    Uniform Fraudulent Transfer Act, and to recover the value thereof from Mr. Frank

2    pursuant to section 550(a)(1) of the Bankruptcy Code and section 220(2) of the Nevada

3    Uniform Fraudulent Transfer Act.

### COUNT III: BREACH OF FIDUCIARY DUTY
#### (Against Mr. Frank)

6    87.    The Trustee realleges and incorporates by reference each of the

7    foregoing allegations of this Complaint as if fully restated here.

8    88.    In his roles as director, chief executive officer and president of the

9    Debtor, Mr. Frank owed fiduciary duties to the Debtor.

10    89.    Mr. Frank knowingly and intentionally violated his fiduciary duties

11    to the Debtor by refusing to conduct shareholder meetings, entering into the Zyen

12    financing, failing to make payments on the Zyen note, entering into the October 2007

13    Zuffa agreement, ordering product with the UFC label knowing that the Debtor would

14    breach the agreement and then cooperating in the strict foreclosure of the Debtor's

15    assets, all for personal gain and so as to enable Zyen to take control and ultimately

16    ownership of the Debtor's assets and business.

17    90.    In so breaching his fiduciary duties, Mr. Frank caused millions of

18    damages to the Debtor, and caused it to fail.

19    91.    On account of the foregoing, judgment should entered for the

20    Trustee, and against Mr. Frank, in an amount to be determined at trial, but no less than

21    $100,000, plus costs.

### COUNT IV: INSIDER PREFERENCE
#### (11 U.S.C. § 547)
#### (Against Mr. Sanford)

92.    The Trustee realleges and incorporates by reference each of the

foregoing allegations of this Complaint as if fully restated here.

93.    Prior the Petition Date, the Debtor was indebted to Mr. Sanford.

13

94. Within the one year prior to the Petition Date, on or about October 5, 2007, Mr. Sanford received a payment of approximately $257,000 from the Debtor, or from property of the Debtor (the "Sanford Payment").

95. At the time of the Sanford Payment, Mr. Sanford was an insider of the Debtor in that he was a director.

96. The Sanford Payment was made to Mr. Sanford for or on account of an antecedent debt owed by the Debtor to Mr. Sanford before the payment was made.

97. The Sanford Payment was made while the Debtor was insolvent.

98. The Sanford Payment enabled Mr. Sanford to receive more than Mr. Sanford would have received in this Case if the Case were a case under Chapter 7 of the Bankruptcy Code, the Payment had not been made and, instead of the Payment, Mr. Sanford had received payment on its claim under the applicable provisions of the Bankruptcy Code.

99. Accordingly, the Trustee is entitled to avoid the Sanford Payment pursuant to section 547(a) of the Bankruptcy Code, and is entitled to recover the amount of such Payment from Mr. Sanford pursuant to section 550(a)(1) of the Bankruptcy Code.

**COUNT V: INSIDER TRANSFER**
**Nevada Uniform Fraudulent Transfer Act**
**(NRS 112.140 et seq.)**
**(Against Mr. Sanford)**

100. The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

101. At the time of each of the Sanford Payment, Mr. Sanford was an insider of the Debtor under section 150(7) of the Nevada Uniform Fraudulent Transfer Act in that defendant was a director of the Debtor.

102. At the time of the Sanford Payment, Mr. Sanford had reasonable cause to believe that the Debtor was insolvent.

103. Accordingly, the Trustee is entitled to avoid the Sanford Payment pursuant to section 544(b) of the Bankruptcy Code and sections 190 and 210 of the

1  Nevada Uniform Fraudulent Transfer Act, and to recover the value thereof from the Mr.

2  Sanford pursuant to section 550(a)(1) of the Bankruptcy Code and section 220(2) of the

3  Nevada Uniform Fraudulent Transfer Act.

4
      ### COUNT VI: BREACH OF FIDUCIARY DUTY
5      (Against Mr. Sanford)

6          104.    The Trustee realleges and incorporates by reference each of the

7  foregoing allegations of this Complaint as if fully restated here.

8          105.    In his roles as director, chief executive officer and president of the

9  Debtor, Mr. Sanford owed fiduciary duties to the Debtor.

10         106.    Mr. Sanford knowingly and intentionally violated his fiduciary

11  duties to the Debtor by refusing to conduct shareholder meetings, entering into the Zyen

12  financing, failing to make payments on the Zyen note, entering into the October 2007

13  Zuffa agreement, ordering product with the UFC label knowing that the Debtor would

14  breach the agreement and then cooperating in the strict foreclosure of the Debtor's

15  assets, all for personal gain and so as to enable Zyen to take control and ultimately

16  ownership of the Debtor's assets and business.

17         107.    In so breaching his fiduciary duties, Mr. Sanford caused millions of

18  damages to the Debtor, and caused it to fail.

19         108.    On account of the foregoing, judgment should entered for the

20  Trustee, and against Mr. Sanford in an amount to be determined at trial, but no less than

21  $100,000, plus costs.

22
      ### COUNT VII: BREACH OF FIDUCIARY DUTY
23      (Against Mr. Bullard)

24         109.    The Trustee realleges and incorporates by reference each of the

25  foregoing allegations of this Complaint as if fully restated here.

26         110.    From and after October 4, 2007, in his roles as director of the Debtor

27  and also as the de facto control person with respect to the Debtor's assets, business and

28  financial affairs, Mr. Bullard owed fiduciary duties to the Debtor.

111.    Mr. Bullard knowingly and intentionally violated his fiduciary duties to the Debtor by causing the Debtor to fail to make payments on the Zyen note, to enter into the October 2007 Zuffa agreement, to order product with the UFC label knowing that the Debtor would breach the agreement, and to cooperate in the strict foreclosure of the Debtor's assets, all for personal gain and so as to enable Zyen to take control and ultimately ownership of the Debtor's assets and business.

112.    In so breaching his fiduciary duties, Mr. Bullard caused millions of damages to the Debtor, and caused it to fail.

113.    On account of the foregoing, judgment should entered for the Trustee, and against Mr. Bullard in an amount to be determined at trial, but no less than $100,000, plus costs.

## COUNT VIII: BREACH OF FIDUCIARY DUTY
### (Against Mr. Sattar)

114.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

115.    Mr. Sattar knowingly and intentionally violated his fiduciary duties to the Debtor by causing the Debtor not to conduct shareholder meetings, to fail to make payments on the Zyen note, to order product with the UFC label knowing that the Debtor would breach the agreement, to cooperate in the strict foreclosure of the Debtor's assets, and to enter into the post-petition Zyen and Zuffa agreements, all for personal gain and so as to enable Zyen to take control and ultimately ownership of the Debtor's assets and business.

116.    In so breaching his fiduciary duties, Mr. Sattar caused millions of damages to the Debtor and its bankruptcy estate.

117.    On account of the foregoing, judgment should entered for the Trustee, and against Mr. Sattar in an amount to be determined at trial, but no less than $100,000, plus costs.

**COUNT IX: PREFERENCE**
**(11 U.S.C. § 547)**
**(Against Fertitta Enterprises)**

118.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

119.    Prior the Extended Avoidance Date, the Debtor was indebted to Fertitta Enterprises.

120.    Within the 90 days prior to the Extended Avoidance Date, on or about October 5, 2009, Fertitta Enterprises received a payment of $1,029,166.67 from the Debtor or from property of the Debtor (collectively, the "Fertitta Payment").

121.    The Fertitta Payment was made to Fertitta Enterprises for or on account of an antecedent debt owed by the Debtor to Fertitta Enterprises before the payment was made.

122.    The Fertitta Payment was made while the Debtor was insolvent, and enabled Fertitta Enterprises to receive more than it would have received in this Case if the Case were a case under Chapter 7 of the Bankruptcy Code, the Payment had not been made and, instead of the Payment, Fertitta had received payment on its claim under the applicable provisions of the Bankruptcy Code.

123.    Accordingly, the Trustee is entitled to avoid the Fertitta Payment pursuant to section 547(a) of the Bankruptcy Code, and is entitled to recover the amount of such Payments from Fertitta pursuant to section 550(a)(1) of the Bankruptcy Code.

**COUNT X: INSIDER PREFERENCE**
**(11 U.S.C. § 547)**
**(Against Fertitta Enterprises)**

124.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

125.    Prior the Petition Date, the Debtor was indebted to Fertitta Enterprises.

17

126.     Within the one year prior to the Petition Date, on or about October 5, 2007, Fertitta Enterprises received the Fertitta Payment.

127.     At the time of the Fertitta Payment, Fertitta Enterprises was an insider of the Debtor in that (a) Mr. Bullard was a director of the Debtor acting on behalf of Fertitta, and (b) Fertitta, through Mr. Bullard, was in control of the Debtor and its business and financial affairs.

128.     The Fertitta Payment was made to Fertitta Enterprises for or on account of an antecedent debt owed by the Debtor to it before the payment was made.

129.     The Fertitta Payment was made while the Debtor was insolvent.

130.     The Fertitta Payment enabled Fertitta Enterprises to receive more than it would have received in this Case if the Case were a case under Chapter 7 of the Bankruptcy Code, the Payment had not been made and, instead of the Payment, defendant had received payment on its claim under the applicable provisions of the Bankruptcy Code.

131.     Accordingly, the Trustee is entitled to avoid the Fertitta Payment pursuant to section 547(a) of the Bankruptcy Code, and is entitled to recover the amount of such Payments from Fertitta pursuant to section 550(a)(1) of the Bankruptcy Code.

## COUNT XI: INSIDER TRANSFER
### Nevada Uniform Fraudulent Transfer Act
### (NRS 112.140 et seq.)
### (Against Fertitta Enterprises)

132.     The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

133.     Prior the Petition Date, the Debtor was indebted to Fertitta Enterprises.

134.     Within the one year prior to the Petition Date, on or about October 5, 2007, Fertitta Enterprises received the Fertitta Payment.

18

135.    At the time of the Fertitta Payment, Fertitta Enterprises was an insider of the Debtor in that (a) Mr. Bullard was a director of the Debtor acting on behalf of Fertitta, and (b) Fertitta, through Mr. Bullard, was in control of the Debtor and its business and financial affairs.

136.    At the time of the Fertitta Payment, Fertitta had reasonable cause to believe that the Debtor was insolvent.

137.    Accordingly, the Trustee is entitled to avoid the Fertitta Payment pursuant to section 544(b) of the Bankruptcy Code and sections 190 and 210 of the Nevada Uniform Fraudulent Transfer Act, and to recover the value thereof from Fertitta pursuant to section 550(a)(1) of the Bankruptcy Code and section 220(2) of the Nevada Uniform Fraudulent Transfer Act.

## COUNT XII: BREACH OF FIDUCIARY DUTY
### (Against Fertitta Enterprises)

138.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

139.    Because Mr. Bullard, at all time pertinent to the allegations of this Complaint, was working for the benefit of and within the scope of his employment with Fertitta Enterprises, Fertitta is liable to the Debtor for Mr. Bullard's breaches of fiduciary duty as alleged herein.

140.    On account of the foregoing, judgment should entered for the Trustee, and against Mr. Bullard in an amount to be determined at trial, but no less than $100,000, plus costs.

## COUNT XIII: FRAUDULENT TRANSFER
### (11 U.S.C. § 548; against Zyen)

141.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

142.    The Zyen Transfer was made while the Debtor was insolvent.

19

143.    The Zyen Transfer was made by the Debtor with the intent to hinder, delay and defraud the Debtor's undersecured and unsecured creditors who existed at the time by causing certain of these creditors to subordinate their security interests and by transferring all of the substantial value in the Debtor's business and assets to Zyen.

144.    Accordingly, the Trustee is entitled to avoid the Zyen Transfer pursuant to section 548 of the Bankruptcy Code, and is entitled to recover the amount of such transfer from Zyen pursuant to section 550(a)(1) of the Bankruptcy Code.

**COUNT XIV: FRAUDULENT TRANSFER**
**Nevada Uniform Fraudulent Transfer Act**
**(NRS 112.140 et seq.; against Zyen)**

145.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

146.    The Zyen Transfer was made while the Debtor was insolvent.

147.    The Zyen Transfer was made by the Debtor with the intent to hinder, delay and defraud the Debtor's secured and unsecured creditors who existed at the time by causing certain of these creditors to subordinate their security interests and by transferring all of the substantial value in the Debtor's business and assets to Zyen.

148.    Accordingly, the Trustee is entitled to avoid the Fertitta Payment pursuant to section 544(b) of the Bankruptcy Code and sections 180 and 210 of the Nevada Uniform Fraudulent Transfer Act, and to recover the value thereof from Fertitta pursuant to section 550(a)(1) of the Bankruptcy Code and section 220(2) of the Nevada Uniform Fraudulent Transfer Act.

**COUNT XV: BREACH OF FIDUCIARY DUTY**
**(Against Zyen)**

149.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

20

150.    Because Mr. Bullard, at all time pertinent to the allegations of this Complaint following the creation of Zyen, was working for the benefit of and within the scope of his employment with Zyen, Zyen is liable to the Debtor for Mr. Bullard's breaches of fiduciary duty as alleged herein.

151.    On account of the foregoing, judgment should entered for the Trustee, and against Zyen in an amount to be determined at trial, but no less than $100,000, plus costs.

## COUNT XVI: EQUITABLE SUBORDINATION
### (11 U.S.C.510(c); against Zyen)

152.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

153.    Zyen's inequitable conduct in controlling the Debtor's financial affairs for its own gain caused substantial harm to the Debtor's unsecured creditors.

154.    Zyen was a party to this inequitable conduct by participating in certain transactions related to the Debtor which it knew, or should have known, were consummated while the Debtor was insolvent and was unable to meet its payment obligations to its unsecured creditors as they became due.

155.    Zyen's inequitable conduct resulted in a transfer of substantial value to Zyen to the direct financial detriment of the Debtor's unsecured creditors.

156.    Equitable subordination of Zyen's claim would be consistent with the Bankruptcy Code because it redresses Zyen's improper conduct that directly harmed the Debtor's unsecured creditors.

157.    Alternatively, any debt extended to the Debtor after Zyen obtained a control position over the Debtor should also be recharacterized as infusions of equity because Zyen intended them not for the purposes of a bona fide loan, but instead to obtain an equity interest in the Debtor's assets and business.

21

## COUNT XVII: SUBSTANTIVE CONSOLIDATION
### (Against Zyen)

158.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

159.    As alleged above, Zyen was created for the sole purpose of becoming the owner of the Debtor's business and assets.

160.    Zyen now owns the Debtor's business and assets.

161.    In view of Zyen's inequitable conduct, the most effective way of placing all parties and parties in interest in the positions they should occupy would be to consolidate the Debtor's bankruptcy estate — now the Liquidating Trust Estate — with Zyen, with Zyen possessing either (or both) an unsecured claim against, or an equity interest in, the consolidated entity.

## CONCLUSION

WHEREFORE, the Trustee prays that this Court (i) enter judgment for him, and against each of the defendants, for the amounts set forth herein, plus interest and costs, (ii) enter an Order (a) transferring any liens securing Zyen's subordinated claims, or the proceeds thereof, to the Debtor's estate; (b) recharacterizing all debt extended to the Debtor while the Debtor was insolvent or in the zone of insolvency to equity, and/or (c) substantively consolidating the Liquidating Trust Estate with Zyen or its successor in interest, and (iii) grant the Trustee such other and further relief as the Court deems just and proper.

Dated: December 29, 2009

Respectfully submitted,


/s/  Jonathan A. Backman

22

Jonathan A. Backman
Law Office of Jonathan A. Backman
117 N. Center Street
Bloomington, Illinois 61701-5001
(309) 820-7420
FAX:  (309) 820-7430
jbackman@backlawoffice.com

*David Herzog, as Liquidating Trustee for the*
  *Estate of Xyience, Incorporated*

23